UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

AMILCAR RAMOS,

                              Petitioner,                DECISION AND ORDER

-vs-

                                                             17-CV-6363 (CJS)

JOHN COLVIN, *Superintendent of*
*Five Points Correctional Facility,*

                              Respondent.
_____

        The petitioner, Amilcar Ramos ("Ramos"), brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Ramos challenges his conviction in the New York Supreme Court on two counts of burglary in the first degree, and one count of robbery in the first degree. For the reasons explained below, the petition for a writ of habeas corpus is denied.

BACKGROUND[1]

        In 2011, Wanda Sanchez and her fiancé, Mark Tardi, occupied the upper unit of a double occupancy rental property located on Sidney Street in Buffalo, New York with their three small children. In the early afternoon of May 14, 2011, Wanda and the children stayed home while Tardi left to pick up Wanda's brother, Jacob Sanchez, to bring him to the house for dinner. After dropping Jacob off at the house on Sidney Street, Tardi then drove to retrieve something from the autoshop where he worked.

---

[1] The following is a summary of the relevant facts that a jury could have reasonably found from the evidence at trial.

As Jacob approached the side door of the house, he was met by two gunmen wearing bandanas, baseball caps and hoodies, who pulled him into the vacant lower unit. Once inside, the gunmen locked the door, bound Jacob with an electrical cord, stole his cell phone and his money, hit him on the crown of his head with the butt of a gun, and stuffed him in a closet. The gunmen then proceeded upstairs to the unit where Wanda and the children awaited Tardi's return.

As the gunmen reached the upstairs unit, Wanda opened the door. One of the gunmen pointed his gun at her, and pushed her back into the house. Wanda and Jacob later stated that one of the gunmen was tall and definitely African American, while the other gunman was significantly shorter and had lighter skin. The short gunman stayed with Wanda and her children and asked about the whereabouts of drugs, money and jewels, while the tall gunman proceeded to ransack the house. Wanda was unable to observe the tall gunman as he ransacked the house, but she noticed that the short gunman was using his cell phone as he kept watch over her and her children. Police would later learn that during the home invasion, the tall gunman was using Jacob's cell phone to call the short gunman to maintain contact while he searched the house.

Approximately thirty minutes after dropping off Jacob, Tardi returned to the house and was surprised to find the doors locked. He attempted to contact both Wanda and Jacob multiple times by cell phone to let him in, and even tried to get their attention by throwing pebbles at the windows of the upstairs unit. But there was no response to Tardi's calls, or his other attempts to get the attention of those inside.

Seeing Tardi in the driveway, Tardi's neighbor, AJ, came out. As Tardi and AJ were conversing, the short gunman emerged from the back of the house, pointed his gun at Tardi

and AJ, and ordered them to get on the ground. Soon thereafter, the tall gunman came around the side of the house with his gun drawn, and Tardi laid face down on the ground. The two gunmen searched Tardi's pockets and took his money and cell phone. While doing so, the tall gunman unknowingly dropped his identification card, which Tardi was able to conceal before the tall gunman noticed.

An elderly neighbor across the street saw what was taking place in Tardi's driveway, and yelled at the two gunmen from her window that she was calling the police. The gunmen then fled on foot across a vacant lot, and Tardi followed at what he believed to be a safe distance. Although the gunmen periodically stopped and pointed their guns at Tardi, he continued to follow them and saw them get into a white Cadillac which they had parked a few blocks away. As the short gunman was getting into the car, he took off his bandana and hat, and Tardi recognized that it was the petitioner, Amilcar Ramos. Although Tardi had never spoken with Ramos, he had seen him many times in the neighborhood and knew him by his nickname, "Gotto."

After the two gunmen drove away in the Cadillac, Tardi returned to his house. He cut Jacob loose from the electrical cords, and got Wanda and the children out of the house and to the car. He then retrieved the identification card that the tall gunman had dropped in the driveway. The identification card indicated that the tall gunman was an African American male by the name of Clarence Scarver, who had recently been released from a New York correctional facility.

When police arrived at the scene, Tardi turned over Scarver's identification card, but did not reveal the name of the short gunman, Ramos, because Tardi was planning to "get him." Nevertheless, based on the identification of Scarver, and Tardi's description of the

getaway vehicle, the Buffalo police eventually developed Ramos as a suspect. Eleven days later, Tardi told the detective assigned to the case that he had seen that Ramos was the second gunman, and Ramos was arrested soon thereafter.

## PROCEDURAL HISTORY

On July 21, 2011, Ramos was indicted on two counts of burglary in the first degree pursuant to New York Penal Law § 140.30, and one count of robbery in the first degree pursuant to New York Penal Law § 160.15. On June 8, 2012, Ramos was found guilty as charged by a jury. He was sentenced, as a second violent felony offender, to a determinate term of twenty-five (25) years imprisonment on each count, to be followed by a five-year period of post-release supervision. All terms of imprisonment were set to run concurrently with each other.

On direct appeal, Ramos, through counsel, raised four arguments. First, Ramos raised a *Batson* argument, stating that he was deprived of his right to equal protection of the law under the Fifth and Fourteenth Amendments to the United States Constitution when the prosecutor made discriminatory use of peremptory challenges during jury selection. Appellant's Brief, *People v. Ramos*, 999 N.Y.S.2d 295 (N.Y. App. Div. 2015). Second, Ramos argued he was deprived of the due process of law under the Fifth and Fourteenth Amendments when he was convicted upon insufficient evidence. *Id.* Third, Ramos argued he was denied a fair trial and due process of law under the Fifth and Fourteenth Amendments when the trial court failed to order a *Rodriguez* hearing, or allow voir dire by defense counsel, to determine whether a witness' voice identification of Ramos was merely confirmatory. *Id.* Lastly, Ramos argued that the sentences imposed upon him were unduly harsh and excessive. *Id.*

On January 2, 2015, the state appellate court rejected all four of Ramos' arguments and unanimously affirmed the jury verdict. The appeals court stated, in pertinent part:

> We reject defendant's contention with respect to the *Batson* procedures . . . . In response to defense counsel's *Batson* challenge, the prosecutor stated that two of the African-American prospective jurors expressed dissatisfaction with the manner in which the police investigated crimes committed against them, while the third answered "yes and no" when asked whether he was satisfied with the police handling of a crime reported by his girlfriend. With respect to the Hispanic prospective juror, the prosecutor stated that he indicated that he was inclined to "speculate" rather than base his decision on the facts presented. We note that the prosecutor also struck a Caucasian prospective juror who stated that a relative did not "get a fair shake" by the prosecution in a prior case, and we conclude that the court did not abuse its discretion in determining that the prosecutor's explanations for his peremptory challenges were not pretextual . . . .
>
> Viewing the evidence in the light most favorable to the People . . ., we reject defendant's further contention that the evidence is legally insufficient to support the conviction . . . . Two of the victims identified defendant at trial as one of the two perpetrators and, although defendant challenged the credibility and reliability of those witnesses, we must assume the truth of their testimony in the context of a challenge to the sufficiency of the evidence. Viewing the evidence in light of the elements of the crimes as charged to the jury . . ., we likewise conclude that the verdict is not against the weight of the evidence . . . We note that "resolution of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the jury" . . ., and we perceive no reason to disturb the jury's resolution of those issues in this case.
>
> We also note that defendant was stopped by the police while driving a vehicle matching the description of the getaway vehicle, *i.e.*, a white Cadillac CTS with large chrome rims and a dark-colored roof. In addition, three calls were made to defendant's cell phone from the cell phone stolen from one of the victims. Those calls were made between 12:57 p.m. and 1:44 p.m. on the day in question, which is when the charged crimes were taking place, and the People presented evidence that defendant's cell phone was "pinging" a cell phone tower close to the crime scene at or about that same time. Under the circumstances, even assuming, *arguendo*, that a different verdict would not have been unreasonable, we conclude that it cannot be said that the jury failed to give the evidence the weight it should be accorded . . . .

> We agree with defendant that the court erred in allowing one of the victims to offer voice identification testimony at trial. Prior to trial, the prosecutor had the victim listen to recordings of telephone calls allegedly made by defendant from jail, and the victim identified the voice of the person making the calls as belonging to defendant. The victim offered similar testimony at trial over defendant's objection. Because the People failed to provide defendant with notice of the pretrial voice identification procedure as required by CPL 710.30(1) . . . . the victim's identification of defendant's voice was not merely confirmatory inasmuch as the victim acknowledged that, although he had heard defendant speak a number of times in the neighborhood, he and defendant had never actually spoken to each other. We thus conclude that the People did not establish as a matter of law that the victim was so familiar with defendant's voice that "the identification at issue could not be the product of undue suggestiveness" . . . .
>
> We nevertheless conclude that the error is harmless. Defendant did not make any incriminating statements in the jail phone call, and, in any event, another trial witness, a deputy sheriff, identified without objection defendant's voice from the same recordings and thus the victim's improper voice identification testimony was cumulative. We conclude that there is "no reasonable possibility that the error might have contributed to defendant's conviction" . . . .
>
> We have reviewed the remaining contentions in defendant's main and pro se supplemental briefs and conclude they do not require modification or reversal of the judgment.

*People v. Ramos*, 999 N.Y.S.2d 295, 296–298 (N.Y. App. Div. 2015). The New York Court of Appeals denied Ramos leave to appeal. *People v. Ramos*, 34 N.E.3d 378 (N.Y. 2015) *reconsid. denied by People v. Ramos*, 38 N.E.3d 842 (N.Y. 2015).

On July 13, 2016, Ramos filed a motion with the state trial court to vacate its judgment under N.Y.C.P.L. § 440.10. Mot. to Vacate, *People v. Ramos*, Indict. No. 1142-2011 (N.Y. Gen. Term, filed July 13, 2016). Ramos sought *vacatur* of his conviction on two grounds. First, Ramos argued that "the prosecution committed a *Rosario* violation by failing to disclose the prior statements of individuals whose names either were on the People's relevant names list or came up at trial." Mem. and Order, *People v. Ramos*, Indict. No. 1142-2011 (N.Y. Gen. Term, filed Jan. 13, 2017). Second, Ramos argued that "the prosecution

6

committed a *Brady* violation by failing to disclose evidence that someone named Jamal Rice, and not the defendant, committed the crimes with codefendant Clarence Scarver." *Id.*

In its memorandum and order denying Ramos' § 440.10 motion, which was filed on January 13, 2017, the state trial court stated:

> In the instant case, the allegation that the prosecution had information about the culpability of Mr. Rice in the commission of these crimes and withheld the information from the defense has not been substantiated. The defendant has failed to proffer any evidence beyond unsupported allegations, innuendo, surmise and excessive speculation to support his contention that the prosecution engaged in the alleged misconduct.
>
> Furthermore . . . the defendant has not included the police report that allegedly includes information referencing Mr. Rice as the accomplice of codefendant Scarver. Mr. Rice's name was not suppressed inasmuch as his name, along with other names, was on the People's relevant names list . . . The defendant has failed to meet the burden of establishing a reasonable probability that nondisclosure of the evidence affected the outcome of his trial . . . .
>
> In addition, the *Rosario* claim is without merit. The prosecution is required to disclose any written or recorded statement made by a person whom the prosecutor intends to call as a witness at trial and which relates to the subject matter of the witness's testimony . . . . This obligation does not extend to individuals who are not called as witnesses, even though their names appear on the People's relevant names list or they are mentioned by another witness at trial.

*Id.* (citations omitted).

On October 10, 2016, Ramos filed a motion for a writ of error *coram nobis*, arguing that he was denied the effective assistance of appellate counsel. Pet. at 4. Ramos' motion for writ of error *coram nobis* was denied on February 3, 2017. *People v. Ramos*, 46 N.Y.S.3d 461 (N.Y. App. Div. 2017).

On May 6, 2017, Ramos filed *pro se* the instant petition seeking a writ of habeas corpus. The Court is in possession of, and has reviewed, the state record, including transcripts of the trial, Ramos' direct appeal to the Appellate Division and the New York

Court of Appeals, and Ramos' § 440.10 motion. Ramos has not challenged the record below as inaccurate. Accordingly, the Court finds that an evidentiary hearing is not necessary in this case.

## LEGAL STANDARD

Ramos brings his habeas corpus petition pursuant to 28 U.S.C. § 2254. The general legal principles applicable to such a claim are well settled. Federal courts are obliged to give deference to state courts' decisions. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214). "First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). "Should the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 82–84 (1977)). For claims adjudicated on the merits in state court, a federal court may issue a writ of habeas corpus only when the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *Chrysler*, 806 F.3d at 117 (quoting 28 U.S.C. § 2254(d)(1)).

A principle is "clearly established Federal law" for § 2254 purposes when it is embodied in a Supreme Court holding framed at the appropriate level of generality. *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting, *inter alia*, *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)), *cert. denied*, 138 S. Ct. 2578. A state court decision is "contrary to" such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law, or has

"decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Washington*, 876 F.3d at 403 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). An "unreasonable application" of such clearly established law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case such that "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Washington*, 876 F.3d at 403 (citation omitted).

## DISCUSSION

Because Ramos is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). In his petition, Ramos identifies six grounds upon which he believes his sentence should be modified or vacated. Respondent argues that all of Ramos' claims lack merit. The Court agrees with Respondent. For ease of discussion, the Court addresses Ramos' arguments out of order.

### The Prosecution's Peremptory Challenges

Ramos argues that he was denied the equal protection of the law and a fair trial when "the prosecutor used discriminatory preemptory [sic] challenges during jury selection of prospective jurors who were either African American or Hispanic." Pet. at 6. In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court outlined a three-step burden-shifting framework for determining whether the prosecution violated a defendant's constitutional rights by exercising its peremptory challenges in jury selection on the basis of race. First, the defendant must establish a prima facie case of racial bias. *Id*. at 96–97. If

9

the defendant establishes a prima facie case, the prosecution must then offer a race-neutral explanation for its challenge to the jurors in question. *Id.* at 97. Even if the reasons the prosecution provides are neither "persuasive, [n]or even plausible," as long as those reasons are facially valid, the burden moves back to the defendant to prove that the prosecution's stated reasons are a pretext for purposeful discrimination. *Id. See also Majid v. Portuondo*, 428 F.3d 112, 126 (2d Cir. 2005).

"[T]he third step of the *Batson* inquiry requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000) (internal quotation and citation omitted). Trial courts applying the third *Batson* prong need not recite a particular formula of words, or mantra. *Galarza v. Keane*, 252 F.3d 630, 640 n. 10 (2d Cir. 2001). However, the Second Circuit has repeatedly said that a trial court must somehow "make clear whether [it] credits the non-moving party's race-neutral explanation for striking the relevant panelist." *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir. 2006).

During jury selection, Ramos' trial counsel described the circumstances he believed justified a *Batson* challenge:

> [Y]esterday there was one African-American female out of fourteen jurors. She was the only African-American female on that panel and the only minority on the panel from yesterday . . . and the prosecutor executed a peremptory challenge . . . . Now we have the prosecutor who's peremptorily challenged Juror Number One, who is an African-American male. He's also peremptorily challenged Juror Number Five, which is Torres . . . . I don't believe that there's a race-neutral reason in the world why he would get rid of the only two African-Americans we've had so far and now only one Hispanic juror . . . .

Trial Tr. vol. II, 148–149 May 30, 2012.

After Ramos' objection, the prosecutor noted that he had not challenged all prospective jurors that were African-American, and the trial court denied Ramos' objection. Trial Tr. at 149–150. The prosecutor then put the reasons for his juror challenges on the record: namely, that two of the jurors expressed dissatisfaction with the Buffalo police department, and the third juror stated a tendency to speculate. Trial Tr. at 149–150. As noted above, the state appeals court affirmed the trial court's ruling on this issue based on the prosecutor's reasoning. *Ramos*, 999 N.Y.S.2d at 296.

The Court finds that the trial court did make clear that it credited the prosecution's race-neutral explanation for striking the two African-American prospective jurors, and the Hispanic prospective juror. Although the trial court initially denied Ramos' objection before hearing the prosecution's full explanation, the prosecution did ultimately offer its reasons, and the trial court revisited its ruling, telling Ramos that "going back to the first time when you [objected], the [prosecutor] responded with neutral reasons . . . . they did respond, they did give neutral reasons . . . ." Trial Tr. at 152. After giving Ramos a second opportunity to meet his burden under *Batson* to show discriminatory intent, the trial court concluded, "The [prosecution has] provided race-neutral reasons that are non-pretextual and [Ramos'] *Batson* motion is denied." Trial Tr. at 157.

Sufficiency of the Evidence

Ramos argues that he was denied the due process of law and a fair trial because he was convicted based on inconsistent testimony, including misidentification of Ramos as the short, lighter skinned gunman by Wanda Sanchez. Pet. at 7. In a challenge under 28 U.S.C. § 2254 to the evidentiary sufficiency of a state criminal conviction, the district court reviews the evidence in the light most favorable to the State and the applicant is entitled to habeas

11

corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial. *Ponnapula v. Spitzer*, 297 F.3d 172 (2d Cir. 2002). The habeas petitioner bears a "very heavy burden" in convincing a federal court to grant a petition on the grounds of insufficient evidence. *Id. See also Coleman v. Johnson*, 566 U.S. 650, 654 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) ("evidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'").

This Court agrees with the state appeals court that, viewing the evidence in a light most favorable to the prosecution, there are no grounds for disturbing the jury's verdict. Wanda Sanchez, who had been held at gunpoint at close range by the short gunman for several minutes, testified that despite his bandana and hat at the time of the crime, she recognized him by his eyes, build and body movement. Trial Tr. vol. III, 360–365 May 31, 2012; Trial Tr. vol. IV, 374–376 Jun. 4, 2012. Mark Tardi testified that he had seen Ramos on several occasions previously in the neighborhood, particularly near Ramos' father's store, and that he saw Ramos take off his face covering and get into the car to flee the scene of the crime. Trial Tr. vol. V, 691–697 Jun. 5, 2012. Buffalo Police Detective Rooney testified that Ramos had been pulled over driving a Cadillac matching Tardi's description. Trial. Tr. vol. IV at 508. Lastly, evidence was introduced that showed three calls made from Jacob Sanchez's cell phone, which was in the tall gunman's – Scarver's – possession during the home invasion, to Ramos' cell phone during the time that the home invasion was transpiring. Trial Tr. V at 532–559. During those calls, Ramos' cell phone was "pinging" cell towers in the vicinity of the Sidney Street home. *Id.*

Failure to Disclose

Ramos argues that the prosecution violated his constitutional rights by failing to disclose certain information required under the Constitution. In particular, Ramos argues that the prosecution violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose to him statements of other persons of interest that "could have exonerated [Ramos] of the crime." Pet. at 21. In addition. Ramos argues that the prosecution violated his rights under *People v. Rosario*, 173 N.E.2d 881 (1961), by failing to make pretrial disclosure of statements made by the prosecution's witnesses Detective Joseph Higgins and Mark Tardi. Pet. at 20.

At the outset, without taking a position as to whether or not the prosecution did in fact fail to turn over *Rosario* material, the Court notes that it is well-settled that the failure to turn over *Rosario* material is not a basis for federal habeas relief. *Green v. Artuz*, 990 F. Supp. 267, 274 (S.D.N.Y. 1998). *Rosario* is a New York state evidentiary rule, and the state courts have stressed that the rule is not based on the Federal Constitution. *See, e.g., People v. Jackson*, 78 N.Y.2d 638, 644, (1991) ("Rosario is not based on the State or Federal Constitution. It is, in essence, a discovery rule . . . ."). Therefore, the Court finds there is no merit in Ramos' *Rosario* claims.

The Court finds no merit in Ramos' *Brady* claims, either. "A defendant seeking a new trial on the basis of an alleged *Brady* violation bears the burden of demonstrating both that the Government suppressed exculpatory information and that this information was material." *United States v. Brunshtein*, 344 F.3d 91, 101 (2d Cir. 2003) (citing *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995)).

Ramos first raised his Brady claim in a motion before the state trial court to vacate his sentence pursuant to New York Civil Procedure Law § 440.10. There, as here, he stated that the prosecution failed to disclose statements from two individuals, Nelmar Cespedes and Jamal Rice, that would have demonstrated that Ramos did not commit the crime. However, as the state trial court noted in its decision, Ramos has not produced any evidence that such statements exist. Although Jamal Rice was on the "Relevant People" list submitted by the prosecution prior to the case, and although the prosecution did refer to conversations that both Mark Tardi and Ramos allegedly had with Nelmar Cespedes, Ramos has failed to carry his burden to show that the prosecution suppressed exculpatory statements by these individuals because Ramos has failed to show that such statements even exist.

Tardi's Voice Identification of Ramos

Ramos argues that he was deprived of his due process rights and a fair trial when the trial court failed "to order a *Rodriguez* hearing or allow a voir dire by defense counsel to determine if the state['s] witness Mark Tardi['s] voice identification of [Ramos] could be considered confirmatory." Pet. at 7. Under New York Civil Procedure Law § 710.30, the prosecution in a state criminal case must "inform defendant that they intend to offer identification testimony at trial, putting defendant on notice of the potential need to make a motion to suppress." *People v. Rodriguez*, 593 N.E.2d 268, 271 (N.Y. 1992). The New York Court of Appeals carved out a narrow exception to the § 710.30 notice requirements where the identification is merely "confirmatory;" that is, "[i]n cases in which . . . the protagonists are known to one another, [and] 'suggestiveness' is not a concern . . . ." *Rodriguez*, 593 N.E.2d at 271 (quoting *People v. Gissendanner*, 399 N.E.2d 924 (1979)). The purpose of a so-called

14

*Rodriguez* hearing is to establish whether, under New York state law, an identification is confirmatory. *Youngblood v. Conway*, 426 F. Supp.2d 107, 122 (W.D.N.Y. 2006) (citation omitted).

During Mark Tardi's testimony at trial, the prosecution asked Tardi to verify whether he had listened to a recording of a phone call Ramos made from jail to Nelmar Cespedes, an individual that Tardi had known since Pre-K. Trial Tr. vol. V at 720–724. Ultimately, the prosecution introduced several such recordings into evidence, in which Ramos spoke from jail with friends such as Cespedes and urged them to approach Tardi and encourage him not to testify against Ramos. *See, esp.,* Trial Tr. vol. VI at 908–929 (capturing the testimony Deputy Sheriff Joseph Higgins about the recordings he made of Ramos' calls from the Buffalo jail).

As indicated above, in conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Insofar as the decision as to whether to grant a *Rodriguez* hearing is solely a matter of state law, the general rule is that it is not reviewable on a habeas petition. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.) Further, with respect to pre-trial hearings on the admissibility of a witness' identification of a defendant, the Supreme Court has declared "that ordinarily the failure to hold a hearing, even if erroneous, will not cross the threshold of constitutional violation." *Alvarez v. Fischer*, 170 F. Supp.2d 379, 384 (S.D.N.Y. 2001) (discussing *Watkins v. Sowders*, 449 U.S. 341, 348–349 (1981)). In other words, Ramos' argument that the trial court failed to hold a *Rodriguez* hearing amounts to a claim based

upon an alleged error of state law, which is not a cognizable grounds for grant of a habeas petition in federal court.

Accordingly, the Court finds that the state court's refusal to hold a *Rodriguez* hearing on Tardi's identification of Ramos could not have been contrary to, nor an unreasonable application of, clearly established federal law. *See Alvarez*, 170 F.Supp.2d at 384. *See also Goico v. David*, No. 04-CV-1090, 2008 WL 163594, at *5 (N.D.N.Y. Jan. 16, 2008).

Excessive Sentence

Ramos argues that his sentence to twenty-five years imprisonment for each of the three crimes of which he was convicted was excessive. However, a challenge to the term of a sentence does not present a cognizable constitutional issue if the sentence falls within the statutory range. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). Further, a petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir. 1977).

Ramos was convicted of two counts of burglary in the first degree, and one count of robbery in the first degree, all of which are class B felonies under New York law. *See* N.Y. Penal § 140.30, § 160.15. Ramos admitted at sentencing that he was a second violent felony offender. Trial Tr. (Sentencing) 3 Jul. 26, 2012. Thereafter, the trial court gave him a determinate sentence to twenty-five years imprisonment and a five-year period of post-release supervision for each charge, all to run concurrently. *Id.* at 6–7.

New York Penal Law § 70.04(3)(a) provides that the term of a determinate sentence for a second violent felony offender "must be at least ten years and must not exceed twenty-

five years." Thus, Petitioner's sentence was within the statutory range, and his challenge does not present a cognizable constitutional issue.

Ineffective Assistance of Appellate Counsel

Lastly, Ramos argues that his constitutional rights were violated when he received the ineffective assistance of counsel in his direct appeal. Pet. at 21. On habeas review, the *Strickland* test for claims of trial counsel's ineffectiveness also applies to claims of ineffective assistance of appellate counsel. *Mayo v. Henderson*, 13 F.3d 528 (2d Cir. 1994); *Claudio v. Scully*, 982 F.2d 798 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993). A petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful. *Mayo*, 13 F.3d at 533–34; *Smith v. Robbins*, 528 U.S. 259, 285 (2000). A habeas petitioner establishes constitutionally deficient assistance if he shows that his appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000).

In the present case, Ramos states that "[a]ppellate counsel erred by ignoring the many inconsistencies in the [prosecution's] witness trial testimony." *Id.* Additionally, Ramos argues that the state appeals court erred in its decision regarding the harmlessness of Tardi's voice identification of Ramos because of "appellate counsel['s] improper representation [of the issue] on direct appeal." *Id.* at 22. After reviewing the record, and in particular Ramos' appellate brief, the Court finds that Ramos' arguments lack merit because the issues raised by appellate counsel were well-argued and potentially meritorious. *Congelosi v. Miller*, 611 F. Supp. 2d 274, 311–12 (W.D.N.Y. 2009).

17

Notwithstanding Ramos' assertion to the contrary, appellate counsel did challenge the credibility of the testimony that was central to his conviction. For instance, appellate counsel argued that Wanda Sanchez's in-court identification of Ramos was "dubious testimony [that] is simply too incredulous and questionable given the fact that she told the police that both suspects' faces were covered by bandanas, hoodies, and baseball caps, and that she told police after the incident that she . . . could not identify either suspect." Appellant's Brief at 26. In addition, appellate counsel argued that Mark Tardi's testimony, too, was "unreliable and dubious," since Tardi was "a former felon with a sordid history as a drug dealer, and a willingness to place his interests above those of society." *Id.* at 28. Moreover, counsel argued, "[t]he sheer brevity of the encounter between Tardi and the suspects during the incident, the fact that . . . both suspects were concealed by bandanas, hoodies, and baseball caps and pointed handguns at him, contributed toward the misidentification of" Ramos. *Id.* at 30–37. Appellate counsel also challenged the reliability of the expert testimony provided by the cell phone records custodian based on the range of cell tower coverage (2 to 10 miles) and the manner in which calls are routed during high volume periods. *Id.* at 29.

With respect to appellate counsel's presentation of the "voice identification" issue on appeal, the Court finds no grounds for an ineffective assistance claim. Not only did counsel competently outline the law (Appellant's Brief at 42–44), but also made an effective application of that law to Ramos' case (*Id.* at 41–42, 44–45).

## CONCLUSION

Based on the foregoing, the Court finds that Ramos has failed to show that his conviction was "contrary to," or involved an unreasonable application of, clearly established

Federal law.  28 U.S.C. § 2254(d)(1).  Accordingly, Ramos's application under 28 U.S.C. § 2254 [ECF No. 1] is denied.  The Clerk of the Court is hereby ordered to close this case.

Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Ramos has not made a substantial showing of the denial of a constitutional right.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

Dated:   December 14, 2020
         Rochester, New York

ENTER:

*Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge